IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF KOTA G. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF KOTA G. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ASHLEY G., APPELLANT.

Filed June 13, 2023.    Nos. A-22-758 through A-22-760.

Appeals from the County Court for Custer County: TAMI K. SCHENDT, Judge. Affirmed.

Matthew D. Furrow, of Borders Law Office, for appellant.

Steven R. Bowers, Custer County Attorney, for appellee.

Madeline G. Smith, guardian ad litem.

PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Ashley G. appeals from the county court for Custer County sitting as the juvenile court. After hearing, the juvenile court terminated Ashley's parental rights to her three minor children, Eric G. (born 2014), Kota G. (born 2016), and Elena G. (born 2018). Ashley challenges the sufficiency of evidence in support of termination. For the reasons that follow, we affirm.

## BACKGROUND

This family's history with the Nebraska Department of Health and Human Services (DHHS) began in 2015 with reports of hazardous and unsanitary living conditions in the home. At that time, Ashley was married to the children's father, Chris G., who relinquished his parental

- 1 -

rights to the children in December 2021, and will be discussed only as necessary to resolve Ashley's claims on appeal. The 2015 intake was "court substantiated" and Eric, who was Ashley's only child at the time, was removed from the home for about 18 months. DHHS received a second report of physical neglect in 2017, but that report was ultimately declared unfounded.

In May 2017, Ashley filed a petition and affidavit for a domestic abuse protection order, alleging that Chris had been physically abusive to both herself and Eric. The district court for Custer County entered a domestic abuse protection order against Chris, and Ashley also filed for divorce around that time. However, in July 2017, Ashley filed, and the district court granted, a motion to vacate the protection order, and Ashley's divorce filing was dismissed a few months thereafter. DHHS received a third report of physical neglect of the children in 2019, which report was also declared unfounded.

In March 2020, DHHS received the fourth and fifth intakes pertaining to this family. First, DHHS received a report of Chris physically abusing Eric, and a couple days later, there were additional reports of unsanitary living conditions in the home. Those intakes were both court substantiated, and they ultimately gave rise to the present termination proceedings. Following these intakes, the children were removed from the home and placed with a paternal aunt, which is where they remained throughout the remainder of the juvenile court proceedings.

The State filed juvenile petitions alleging that each of the children came within the provisions of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2022). The central allegations were physical abuse by Chris and unsanitary living conditions in the home. There was no dispute that Ashley was not present for the physical abuse. Both Ashley and Chris pled no contest to the allegations in the juvenile petitions, and the juvenile court adjudicated all three children as juveniles under § 43-247(3)(a).

Under the first case plan, which was approved by the juvenile court in August 2020, Chris and Ashley were ordered to participate jointly in 20 hours of supervised visitation per week. DHHS caseworkers reported concerns that Chris and Ashley struggled to provide adequate food and supplies, "such as diapers and wipes," for the children during visits. Caseworkers also reported concerns of ongoing domestic violence between Chris and Ashley. The second case plan, approved in November 2020, remained largely unchanged, and caseworkers reported "little to no progress being made . . . as the home is still unclean and the parents rely on services for guidance." Caseworkers further recommended that visitation remain fully supervised "due to concerns that the children will not be safe without visitation workers present for redirection, particularly as Chris has become escalated with Eric during visits."

Under the third case plan, approved in April 2021, Chris and Ashley were ordered to participate in visitation separately, as Ashley had asked Chris to move out of the home in February 2021. Caseworkers reported that "[i]t was becoming evident to Ashley that reunification was going to be very difficult with Chris in her home, so she made the decision to ask him to leave [, and she] is currently working on filing for divorce." Ashley began to have unsupervised visits with the children four days per week. It was further reported that Ashley successfully completed a parenting class in January 2021, and that she was participating regularly in individual therapy. Caseworkers also reported some progress in the cleanliness of Ashley's home and in her ability to provide adequate food and supplies for the children during visits. In light of the progress that Ashley made after Chris moved out of the home, DHHS recommended that the children be transitioned back to

Ashley's home when school got out for the summer, albeit with a period of "intensive in-home services" to ensure successful reunification.

Despite this recommendation, the record reflects that the children were not returned to Ashley's home at that time, and caseworkers later reported a regression in the progress that Ashley had been making. In the fourth case plan, which was prepared in August 2021, caseworkers reported renewed concerns with the cleanliness and lack of structure in Ashley's home. Caseworkers also reported increasing concerns regarding continued contact between Ashley and Chris, as Ashley had reported that Chris "often" came to her home to shower and do laundry. Ashley reported that Chris was never in the home when the children were present but that the children knew Chris was spending time in the home.

Additionally, caseworkers received reports from members of the community that Chris and Ashley had been seen together around town, and they were reportedly sharing a vehicle and working at the same location at the time. Caseworkers also reported that Chris "stated several times that when the court case closes, he will have his family back together." Altogether, DHHS recommended that the children remain placed outside the home and that a motion for termination of Chris and Ashley's parental rights be filed. In support of this recommendation, caseworkers cited lack of progress toward reunifying the children with either parent, continued contact between Ashley and Chris, and concerns about the condition of Ashley's home and her parenting ability.

In September 2021, the State and the guardian ad litem for the children filed joint motions to terminate the parental rights of both Chris and Ashley. The matter was set for a plea hearing in December, and at that hearing, the juvenile court was advised that Chris intended to relinquish his parental rights. Moreover, the guardian ad litem informed the court that if Chris were to relinquish his parental rights, then she would be requesting additional time to determine whether to recommend reunification with Ashley. Chris relinquished his parental rights on December 13. At a subsequent status hearing on January 10, 2022, the State and the guardian ad litem made a joint oral motion to dismiss the motion to terminate Ashley's parental rights, and DHHS was ordered to prepare an updated case plan with respect to Ashley.

The fifth case plan, which was the first pertaining to Ashley alone, was prepared in April 2022. Caseworkers reported that Ashley was participating in 15 hours of supervised visitation per week. Caseworkers noted ongoing concerns that the visitation worker "does more parenting than Ashley, and when redirected, Ashley has gotten upset and started screaming at the worker." There were also reported concerns that Ashley struggles to enforce rules, lacks patience, "and overall appears to struggle with longer visits." It was further reported that Ashley finalized her divorce from Chris in February 2022, and that Ashley no longer worked at the same location as Chris. However, there were continued reports of Chris and Ashley being seen together and reports of Ashley driving Chris's vehicle. Altogether, caseworkers reported "[i]t is evident that Ashley is not able to separate from Chris entirely."

Importantly, caseworkers reported on an "intensive family preservation" (IFP) service which was implemented in Ashley's home from January 27, 2022, to March 10, 2022. IFP was a six-week intensive in-home program consisting of two support workers, a therapist, and a skill-builder. Following IFP, the support workers applauded Ashley's effort and recommended increased visitation time for her to begin implementing the skills addressed throughout the program. However, the IFP workers also opined that Ashley was not yet prepared to be reunified

with the children. According to DHHS caseworkers, "IFP stated that Ashley continues to overall struggle with mental health and not having services . . . it would be hard for Ashley to sustain if the kids came home today; this would be setting Ashley up for failure." Rather, the IFP workers recommended that Ashley "continue working towards reunification with increased services in the home."

While the IFP workers that worked with Ashley for those six weeks recommended that Ashley continue working toward reunification with increased services, the perspective of DHHS caseworkers was that IFP was intended to be Ashley's "last chance to work toward reunification." As such, because the IFP workers could not recommend reunification at the time IFP concluded, the ultimate recommendation under the fifth case plan was to file a second motion to terminate Ashley's parental rights and pursue permanency for the children in their foster placement.

In April 2022, the State and the guardian ad litem jointly filed the second motion to terminate Ashley's parental rights with respect to all three children. The motion alleged statutory bases for termination under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Cum. Supp. 2022). Specifically, the motion alleged that Ashley had been unable to make progress toward reunification, that she continued to have contact with Chris despite their divorce and Chris relinquishing his parental rights, and that the children had been in an out-of-home placement for 25 months. The hearing on the motion for termination took place over the course of three days on July 21, July 22, and August 29.

There was no dispute that a statutory basis for termination existed under § 43-292(7). Thus, the central question at the hearing was whether termination was in the best interests of the children, and the primary disputes with regard to that question pertained to Ashley's progress toward reunification and her continued contact with Chris. In general, there was no dispute that Ashley loved her children and that the children loved Ashley. Rather, the position of the State and the guardian ad litem was that Ashley was unfit to parent her children on her own without the support of court-ordered services, such that reunification was not realistic in the foreseeable future.

In addition to reiterating the information contained in the periodic reports to the juvenile court discussed above, DHHS caseworker, Kiela Richards, testified that she believed DHHS provided Ashley with "every service and resource available," yet Richards "didn't see any change" in Ashley's ability to parent or protect her children. Richards ultimately opined that Ashley was not fit to parent her children on her own. Richards emphasized the children's need for permanency and the length of time the children had been placed outside the home. While Richards acknowledged that Ashley "did well at the IFP process," she also reiterated that "we were already two years into the case" at that point. Richards testified that at the time IFP was implemented, the family team agreed to pursue termination if the children were not able to reunify after IFP was completed.

Ashley's IFP therapist, Marlene Knerl, testified that Ashley was receptive to feedback and engaged with the services being provided throughout the IFP process. Knerl added that Ashley "was really putting a grand effort into improving her situation." However, Knerl also testified that she only observed Ashley with the children on one occasion, and she reiterated her opinion that Ashley was not yet prepared to reunify with the children at the conclusion of IFP. Rather, Knerl's recommendation was that Ashley continue working on the skills addressed in IFP and that she be

afforded another round of IFP at some point in the future "to make sure that everything was sustainable" prior to returning the children.

However, another DHHS caseworker, Kerry Bumgarner, testified that as of July 2022, there remained concerns regarding the cleanliness of Ashley's home and her ability to provide adequate supervision and a stable living environment for the children. Bumgarner opined that while Ashley loves her children, she cannot provide the routine and structure that they need. Bumgarner agreed with Knerl's assessment that returning the children to Ashley's home at that time "would be setting her up for failure," and Bumgarner added that she believed it would be "extremely overwhelming" for Ashley.

One of Ashley's visitation workers, Benjamin Arrowood, testified to his observations at a number of visits in May and June 2022. Arrowood testified that Ashley was making "minimal" progress toward reunification at that time. Arrowood's visitation notes illustrate that he was often responsible for supervising and redirecting the children, and that Ashley struggled to establish boundaries and rules in an appropriate manner. Arrowood also documented concerns with time management and overall structure during the visits. Arrowood ultimately echoed the opinions of Richards, Knerl, and Bumgarner, that Ashley was not prepared to reunify with her children without continued support services in place in the home.

The persistent concerns regarding Ashley's ability to parent the children by herself accentuated ongoing concerns about Ashley's continued contact with Chris and the possibility that she would allow him back into the children's lives if reunification occurred. Richards testified to reports that Chris and Ashley continued to have "significant contact" in the year prior to the termination hearing, and she reiterated DHHS' concerns regarding Chris' statement that "he was going to get his family back together" after the court case concluded.

While Ashley denied having contact with Chris after he relinquished his parental rights in December 2021, multiple witnesses reported observing Chris and Ashley together since that time. For example, a DHHS caseworker, Randi Golightly, testified that she observed Chris and Ashley walking down the street together in February 2022. Visitation worker, Jessica Goodall, reported seeing Chris walking down the street near Ashley's house while transporting the children to Ashley's house for a visit on July 2. Ashley's neighbor testified that she observed Chris at Ashley's home "ten times at least" in the four months prior to the August 29, 2022, hearing date. The neighbor provided photographs she took of Chris near Ashley's home on August 2 and again on August 26, which photographs were admitted into evidence. Finally, Chris himself testified to texting Ashley following the July 21 hearing date, and Ashley testified that Chris had come to her home to confront her about relinquishing her parental rights. While Ashley testified that she asked Chris to leave after only a brief conversation, Bumgarner recalled that it was a "scary" incident which raised questions as to Ashley's ability to provide security for herself and the children if they were returned.

After the three-day hearing, the juvenile court entered an order terminating Ashley's parental rights to all three children. The court found that statutory bases for termination existed under § 43-292(2), (6), and (7), and that termination was in the best interests of the children. The court noted that at the time of the hearing, Ashley's visitation was fully supervised and that "it does not appear that safely returning the children to Ashley's care could occur in the foreseeable future." The court emphasized its concern regarding continued contact between Ashley and Chris,

noting the evidence of continued contact discussed above and stating that "the court was able to observe [Chris] in the courtroom at the time of the hearing making hand gestures to Ashley during her testimony." Ultimately, the court concluded that "[a]lthough it is clear that Ashley loves her children, after 30 months Ashley has not demonstrated that she can provide a safe, suitable home for her children and it is not likely that she will be able to in the near future." Ashley appealed.

## ASSIGNMENTS OF ERROR

Ashley assigns that the juvenile court erred in (1) finding that termination of her parental rights was in the best interests of the children, and (2) failing to make an explicit or implicit finding that Ashley was unfit to parent her children.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Manuel C. & Mateo S.*, 314 Neb. 91, 988 N.W.2d 520 (2023) However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

## ANALYSIS

Section 43-292 contains 11 separate subsections, any one of which can serve as a basis for termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Mateo L. et al., supra.* It is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L. et al., supra.*

*Statutory Basis.*

Ashley does not challenge the juvenile court's findings as to the first prong of the termination analysis, however, for the sake of completeness, we briefly address the statutory bases for termination. There is no dispute that the State proved by clear and convincing evidence that a statutory basis for termination exists under § 43-292(7). The children were initially removed from the home in March 2020, and they had been in an out-of-home placement for roughly 25 months by the time the second motion for termination of Ashley's parental rights was filed. Accordingly, we conclude the State proved a statutory basis for termination by clear and convincing evidence.

*Best Interests and Parental Unfitness.*

Ashley raises two assignments of error on appeal. First, she assigns that the juvenile court erred in finding that termination of her parental rights was in the best interests of the children. Second, Ashley assigns that the juvenile court erred in terminating parental rights without making an explicit or implicit finding that Ashley was unfit to parent her children. We note at the outset that parental unfitness is not an explicit element of an action to terminate parental rights under § 43-292. Rather, "some showing of unfitness" has been found by both the Nebraska Supreme Court and the U.S. Supreme Court to be a necessary component of termination proceedings under the Due Process Clause of the U.S. Constitution. *In re Interest Mateo L. et al.*, 309 Neb. at 582,

961 N.W.2d at 529 (citing *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007), quoting *Quilloin v. Walcott*, 434 U.S. 246, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978)). As such, our review of best interests necessarily entails an inquiry into whether the State made an adequate showing of parental unfitness to satisfy the requirements of due process. Thus, we consolidate Ashley's two assignments of error into a single assignment that the juvenile court erred in finding that termination was in the children's best interests.

Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child. *In re Interest of Mateo L. et al., supra.* This is a high hurdle for the State, since a parent's right to raise his or her children is constitutionally protected. *Id.* As such, we apply a rebuttable presumption that it is in the child's best interests to maintain a relationship with his or her parent. *Id.* That presumption can only be overcome by a showing that the parent is either unfit to perform the duties imposed by the relationship or has forfeited that right. *Id.*

Although the term "unfitness" is not expressly stated in § 43-292, we have said that it derives from the fault and neglect subsections of the statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra.* In the context of termination proceedings, parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, the performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests and parental unfitness analyses require separate, fact-intensive inquires, but each examines essentially the same underlying facts. *Id.*

All parties agree that the State's case in support of termination had two central components: first, that Ashley failed to make adequate progress toward reunification throughout the roughly 30 months that this case had been open, and second, that Ashley failed to separate herself from Chris to the extent necessary to protect the children from him. Ashley challenges the first component on the grounds that the State and the guardian ad litem "timed the filing of their second motion to terminate [Ashley's] parental rights while [Ashley] was making significant progress in addressing all concerns that DHHS had regarding her parenting abilities." Brief for appellant at 13. Ashley challenges the second component of the State's case on the grounds that the State relies on only "generalized reports" and "a few specific incidences of contact" between Chris and Ashley. *Id.* at 14.

With regard to the first component, it is true that both Knerl and Richards acknowledged that Ashley put forth great effort in IFP. However, neither of them were able to recommend that she was prepared to reunify with the children at that time. Importantly, Knerl was involved with this family for only six weeks, and she testified that she had only observed Ashley with the children on one occasion. Knerl indicated that she could not recommend reunification until Ashley demonstrated an ability to sustain the skills addressed during IFP through yet another round of IFP at some time in the future. Yet, as evidenced by the visitation reports and continued concerns of caseworkers in the months following IFP, Ashley failed to demonstrate that ability.

Given the length of time that the children had already been removed from the home, Richards testified that IFP was intended as a last resort attempt for Ashley to make significant progress and demonstrate her parental fitness. In light of Chris relinquishing his parental rights and the finalization of Chris and Ashley's divorce, the guardian ad litem stated that the family

team agreed to try IFP because they "did really feel like [Ashley] needed one more chance after we had all of the commitment from Ashley that Chris was out of her life." Yet, none of the support workers involved in Ashley's case at that time were able to recommend reunification at the conclusion of IFP. Perhaps more importantly, the record reflects that Ashley struggled to separate from Chris entirely.

Multiple witnesses, including both DHHS caseworkers and members of the community, reported seeing Chris and Ashley together on numerous occasions even after they finalized their divorce and Chris relinquished his parental rights. The State adduced both witness testimony and photographic evidence of Chris' presence at Ashley's home in the months leading up to, and even between, the hearing dates on the second motion for termination of Ashley's parental rights. When confronted with these accounts, Ashley categorically denied any such contact. To the extent the evidence is in conflict on this point, we consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of events over the other. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

Despite over 24 months of juvenile court involvement, and "every service and resource available to [DHHS]," reunification continued to be dependent on Ashley addressing many of the same concerns that were present at the case's inception. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Mateo L. et al., supra.* Under the circumstances of this case, we conclude that Ashley's lack of progress toward reunification and difficulty maintaining separation from Chris constituted an adequate showing of parental unfitness and established by clear and convincing evidence that termination of her parental rights was in the best interests of the children.

CONCLUSION

For the foregoing reasons, we affirm the order of the juvenile court terminating Ashley's parental rights to all three children.

AFFIRMED.